Filed 10/9/14  unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL E.,<br><br>        Defendant and Appellant. | A138712<br><br>(Mendocino County Super Ct.<br>No. SCTMCRCR 11-19131)<br><br>**ORDER MODIFYING OPINION<br>NO CHANGE IN JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on October 3, 2014, be modified as follows:

1.    On page 1, in the caption and in the first sentence, appellant's full name is replaced with Michael E.  All further references to the appellant's first and last name are replaced with Michael E.

There is no change in judgment.

Dated: _____                 _____

                                                                              Kline, P.J.

1

Trial Court:                    Mendocino County Superior Court

Trial Judge:                    Clayton L. Brennan

Attorney for Appellant:         Maria Leftwich
                                By appointment of the Court of Appeal
                                under the First District Appellate Project

Attorneys for Respondent:       Kamala D. Harris
                                Attorney General of California

                                Dane R. Gillette
                                Chief Assistant Attorney General

                                Gerald A. Engler
                                Senior Assistant Attorney General

                                Eric D. Share
                                Supervising Deputy Attorney General

                                Ronald E. Niver
                                Deputy Attorney General

Filed 10/3/14 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL SHAWN EVANS,<br><br>     Defendant and Appellant. | A138712<br><br>(Mendocino County Super Ct.<br>No. SCTMCRCR 11-19131) |

Appellant, Michael Shawn Evans, was charged with possession of material depicting a person under the age of 18 engaging in or simulating sexual conduct, a felony. (Pen. Code, § 311.11, subd. (a).) After his motion to suppress evidence was heard and denied, appellant entered a plea of guilty. The trial court suspended imposition of sentence and placed appellant on probation for three years subject to specified terms and conditions.

The sole issue presented is whether, as appellant claims, the trial court erred in denying his motion to suppress video files found in a search of his computer because the warrantless search conducted by the police exceeded the scope of a prior private search and therefore violated "a subjective expectation of privacy that society recognizes as reasonable." (*Kyollo v. United States* (2001) 533 U.S. 27, 33.) We conclude that the police's subsequent search of appellant's computer did exceed the scope of the private search and that the trial court therefore erred in denying appellant's motion to suppress.

**FACTS AND PROCEEDINGS BELOW**

On September 27, 2011, appellant brought his computer to Sage's Computer in Fort Bragg for servicing. In the course of working on the computer, Sage Statham viewed images on the computer of what appeared to him "to be underage girls engaged in

1

sexual activity." Statham felt it appropriate to call the Fort Bragg Police Department to inquire whether these materials were "something that they should be looking at." Officer Brian Clark, who responded to the phone call and viewed the files at Statham's computer repair shop, stated that although the girls in the photos he viewed were posing in a sexual manner, none of them were nude or "engaging in sexual activity or simulating any sexual activity."

Indicating he did not consider the images pornographic, Clark asked Statham whether he "could search through and look at" anything else in the computer. After further examining appellant's computer files, Statham found video files he had not previously noticed. When directed by Officer Clark to open these files, Statham tried to but was unable to do so. Statham was, however, able to put the video files on a USB flash drive,[1] which he gave to Officer Clark. Officer Clark took the flash drive to the Fort Bragg Police Department. When he was unable to open the files on his own computer, Clark gave the flash drive to Sergeant Lee, who was able to open and view the videos it contained. Lee informed Clark that he considered the videos "juvenile pornographic material." Clark, who also viewed the videos, described them as depicting "[f]emale juveniles engaged in sexual activity." The next day appellant's computer was seized by Officer Lopez.

On October 12, 2012, after he had waived a preliminary hearing, appellant filed a motion to suppress the evidence seized from his computer and also a demand that the People produce at the suppression hearing "any and all search warrants and arrest warrants relied upon by the prosecution to justify the searches of [his] property." The district attorney maintained that the motion to suppress lacked merit "for two independent reasons. First, the evidence was not obtained by [Sage Statham] illegally, and hence the Fourth Amendment does not apply. Second, [appellant's] expectation of privacy was

---

[1] A "flash drive" is "a data storage device that uses flash memory; *specifically*: a small rectangular device that is designed to be plugged directly into a USB port on a computer and is often used for transferring files from one computer to another." (http://www.merriam-webster.com/dictionary/flash%20drive)

destroyed once Statham as a private citizen[] made the search and revealed his findings to the police; hence any additional investigation by the police of additional 'folders' on that same computer was not the fruit of any poisonous tree."[2] At no time prior to the challenged searches of appellant's computer had the police obtained a search warrant.[3]

For reasons later described, the trial court denied appellant's motion to suppress.

## DISCUSSION

The legal question presented in this case is whether the trial court erred in determining that the searches of appellant's computer that took place after Officer Clark arrived at Statham's repair shop were within the scope of Statham's prior search of appellant's computer.

### I. *Trial Court Background*

The trial court's factual findings, set forth in the ruling denying the motion to suppress, and not challenged, are as follows:

"1. Before calling the police, Statham had viewed only the photographic images of juveniles wearing little clothing and posing inappropriately.

---

[2] The two reasons—which are related, not independent—assume, as was the case, that Officer Clark's search was not made pursuant to a warrant. Nevertheless, the district attorney's written opposition to the motion to suppress confuses this issue by initially arguing that the motion to suppress was "procedurally defective" because the evidence at issue was seized pursuant to a search warrant, which required appellant to file a "*Franks* motion" pursuant to *Franks v. Delaware* (1978) 438 U.S. 154, 156, alleging specific misstatements or omissions in the affidavit, which he has not done."

[3] Officer Clark apparently sought a warrant to conduct a search of the entire contents of the computer shown him by Statham, but not until after he had viewed the videos on the flash drive. Asked why he did not seek a warrant before he directed Statham to make a more thorough search or before he obtained and the police searched the flash drive, Clark stated that he "needed to establish if I had probable cause to get a search warrant." Clark did not believe the search warrant was ever executed, but thought the computer was sent to the Department of Justice. The record contains a copy of what appears to be the warrant Officer Clark referred to, but it does not appear to have been served and, in any case, the affidavit in support of the warrant states that the affiant had previously viewed the evidence appellant later sought to suppress.

3

"2.  The images of the juveniles were sexually suggestive, but not necessarily pornographic.

"3.  Statham and Officer Clark happened upon the video files while Statham was trying to show Clark the photographic images that caused him to contact the police in the first place.

"4.  Statham had not seen the <u>video</u> files nor tried to open them prior to meeting with Officer Clark.

"5.  Officer Clark directed Statham to open the video files during their meeting.

"6.  The sexually explicit titles of the video files were discovered only after Officer Clark directed Statham to open the video files."

Relying on *People v. Wilkinson* (2008) 163 Cal.App.4th 1554 (*Wilkinson*), which adopted portions of the analysis employed in *United States v. Runyan* (5th Cir. 2001) 275 F.3d 449 (*Runyan*), the trial court concluded "that the record sufficiently establishes that Statham showed Officer Clark the photo images that Statham had viewed already, and that Clark's viewing of those photo images was within the scope of the private search and therefore does not implicate the Fourth amendment.  As to the video files, the viewing of those images expanded the private search and constituted a governmental search." Nevertheless, based on its analyses of *Wilkinson* and *Runyan*, the trial court went on to find that the  governmental intrusion was "not problematic under the Fourth Amendment."[4]

The trial court acknowledged that unlike *Runyan*, where the public searcher examined computer discs that had previously been searched by a private party who found images that were unquestionably pornographic, the images that prompted Statham to contact the police were not pornographic.  As the court stated, the images Statham found were "inappropriate, would justifiably raise suspicion, and were obviously offensive to Statham.  However, it is not at all clear that these images were themselves illegal."  The court felt this fact "raises an interesting question; namely, would a government search be

---

[4]  We shall discuss *Wilkinson* and *Runyan* in detail in part II., *post*, of this opinion.

justified if the images found on Evans' computer were patently legal." Without overtly answering that question, the court rhetorically inquired "would Statham be justified in calling Officer Clark over to view the entire contents of Evans computer? Put another way, does a person completely forfeit their [*sic*] expectation of privacy in the contents of their computer when they take it to the store to get repaired?" The trial judge stated that the answer to his rhetorical question lay "in the fact that Evans only had a *reasonable* expectation of privacy in the contents of his computer's hard-drive. Evans did not create a confidential relationship with Statham akin to an attorney-client relationship when he entrusted his computer to Statham. Thus, any reasonable expectation of privacy [he] had in the content of his hard-drive would be eroded in proportion to any legitimate suspicion arising from what Statham discovered in the course of working on the computer. If all Statham found were images of kids riding a pony at a birthday party, it would be reasonable for Evans to expect the content of his computer would not be shared with law enforcement. However, this expectation is not so reasonable when the images are such as to cause Statham to believe in good faith that he has discovered child pornography. Nor is it reasonable for Evans to demand that Statham conclusively determine the images meet the legal definition of child pornography before involving the police. . . . There is no requirement that citizen informants validate their suspicions of criminal conduct before reporting them to the police. By turning his computer over to Statham, Evans diminished the scope of his reasonable expectations to privacy. Figuratively, he was 'hanging his dirty laundry out to dry' by handing it over to a third party he knew was going to take a look at it. The discovery of the sexually charged images of children only further eroded his expectation of privacy. Under these circumstances, it was not unreasonable for Statham to involve law enforcement."

For the foregoing reasons, the trial court concluded that "[Officer] Clark's searches of the videos (both when he first met with Statham, and later at the [Fort Bragg Police Department]), were simply more thorough searches of the hard-drive 'container' that Statham had already opened. Evans' expectation of privacy in his hard-drive, which included the video files, had already been frustrated when he turned his computer over to

5

Statham. Such searches are not in violation of the 4th Amendment, and thus, suppression of the videos is not mandated."

## II. *Legal Analysis*

### The Standard of Review

"In ruling on a motion to suppress, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed facts-law question that is however predominantly one of law, *viz.*, the reasonableness of the challenged police conduct, is also subject to independent review. [Citations.] The reason is plain: 'it is "the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness." ' " (*People v. Williams* (1988) 45 Cal.3d 1268, 1301, abrogated on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 560-561, quoting *People v. Loewen* (1983) 35 Cal.3d 117, 123. )

Because the challenged search was conducted without a warrant, the burden is on the government to prove that the search does not violate the Fourth Amendment. Stated differently, the warrantless search is presumptively unreasonable and therefore presumptively unconstitutional. (*United States v. Jacobsen* (1984) 466 U.S. 109, 114 (*Jacobsen*).) The sole justification the People offer for the warrantless search is that it did not exceed the scope of the prior search by Statham, and therefore is not subject to the Fourteenth Amendment. According to the People, appellant lost any expectation of privacy when he turned his computer over to Statham.

### Relevant Legal Principles

"It is well-settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if

that occurs the Fourth Amendment does not prohibit governmental use of that information.  Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information . . . .  The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated.  In such a case the authorities have not relied on what is in effect a private search, and therefore presumptively violate the Fourth Amendment if they act without a warrant." (*Jacobsen*, *supra*, 466 U.S. at pp. 117-118, fn. omitted; accord *Walter v. United States* (1980) 447 U.S. 649, 657 (plur. opn. of Stevens, J.) (*Walter*).)  "[A]dditional invasions of . . . privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search." (*Jacobsen*, at p. 115.)[5]

In *Wilkinson*, *supra*, 163 Cal.App.4th at page 1559, in which the Third District Court of Appeal addressed the question of when police officers exceed the scope of a private search, and on which the trial court in this case relied, the defendant's roommate, Jessica Schultze, and her boyfriend, Harry Sadler, found signs that led them to believe the defendant was using a webcam attached to Schultze's computer to record Schultze and Sadler together in Schultze's bedroom.  They therefore complained to police that the defendant was recording them surreptitiously.  (*Ibid.*)  When officers arrived at the house, the defendant refused to consent to a search of his room.  After briefly detaining the defendant, Officer Walker told Schultze and Sadler that the police lacked probable cause to arrest him.  When Sadler asked if he could go into the defendant's room, Officer Walker said, " 'Well you can do whatever you want.  It's your apartment. . . .  But keep in mind, you cannot act as an agent of my authority. . . .' "  Walker also said that the defendant had asked that Schultze and Sadler not enter his room.  (*Id.* at pp. 1559-1560.)

---

[5] In *Jacobsen*, employees of a private freight carrier opened a damaged package and saw plastic bags of white powder inside a closed tube.  The Supreme Court held that a federal agent's subsequent removal and testing of a trace of powder did not violate the Fourth Amendment, in light of, inter alia, the private employees' prior search of the tube and the fact that the suspicious nature of the material made it virtually certain that the substance tested was contraband.  (*Jacobsen*, *supra*, 466 U.S. at pp. 111, 125.)

After the officers left, Sadler went into appellant's room to look for more evidence, and picked up about 15 or 20 compact discs he found strewn around the room. Viewing several on Schultze's computer he found "images of himself and Schultze 'hanging out,' 'undressing,' and 'being naked,' with some sexual content but no images of them having sexual intercourse." (*Wilkinson*, *supra*, 163 Cal.App.4th at p. 1560.) Sadler then returned to the defendant's room, opened drawers, and took all the writable compact discs he could find. (*Ibid.*) Sadler told Officer Walker of the additional evidence he had found and showed him images on two of the discs he had already viewed. Walker said he would need more explicit images of Sadler and Schultze having sexual intercourse, and Sadler looked through seven to ten more discs to find such images. In the end, Walker took 36 compact discs Sadler had found in the defendant's bedroom to the police station. After another police officer, Detective Vigon, viewed several of the images, which included some showing Sadler and Schultze "actually having sex," Vigon interviewed the defendant, who admitted obtaining the images from Schultze's computer and who also signed a consent form allowing the police to search his room. (*Id.* at pp. 1560-1561.)

The trial court denied the defendant's motion to suppress on the grounds, first, that the Fourth Amendment was not implicated by Sadler's private search, which Officer Walker had not authorized. (*Wilkinson*, *supra*, 163 Cal.App.4th at p. 1561.) Second, with respect to Officer Walker's viewing of the images on the compact discs, the trial court found that it was not clear from the record whether Officer Walker viewed more of the compact discs than Sadler had viewed. " 'So, the question I guess is still a little bit open, whether or not that is exceeding the scope of the search if, in fact, [Officer] Walker took all of the tapes, although he did not view them with Sadler prior to confiscating them and using them, but certainly conceptually, if Sadler is showing [Officer] Walker some of the tapes that Sadler confiscated from [the defendant], and those tapes at least consist of these images from which a violation occurs, then f[or] my purposes, I don't see a violation of the [F]ourth [A]mendment for this hearing, because the images at least I viewed, were the ones that were shown to Walker by Sadler.' " (*Id.* at pp. 1561-1562.)

8

The Third District Court of Appeal reversed.

Agreeing that Officer Walker did not encourage, instigate, or initiate Sadler's initial search and seizure of the compact discs, or Sadler's viewing of some discs after the police had taken the defendant from the premises, the appellate court rejected the contention that Sadler acted as an agent for the police in searching the defendant's room and in his initial viewing of the defendant's compact discs. (*Wilkinson*, *supra*, 163 Cal.App.4th at pp. 1564-1569.) The Court of Appeal also agreed that Sadler's search was a private search, and that Officer Walker's viewing of the images that Sadler had already seen did not exceed the scope of the private search, and therefore did not violate the Fourth Amendment. (*Wilkinson*, at pp. 1563, 1569.)

The Court of Appeal then addressed whether "the opening and viewing of images on additional compact discs by Sadler and Officer Walker, at Officer Walker's direction (to the extent it may have occurred), and the subsequent viewing of images by Detective Vigon (to the extent he may have looked at discs Sadler had not previously viewed), constituted warrantless governmental searches implicating the Fourth Amendment for which the People fail to show any legal justification." (*Wilkinson*, *supra*, 163 Cal.App.4th at p. 1563.)[6] Finding no California case on point and no consensus among the federal courts that had addressed the issue, the *Wilkinson* court found instructive the opinion in *Runyan, supra*, 275 F.3d 449, which "held that police officers exceed the scope of a private search when they fail to confine their examination of the contents of computer discs to the discs the private searcher examined." (*Wilkinson*, at p. 1570, citing

_____

[6] The People's argument was that " '[w]hile [defendant] may subjectively have expressed an interest in keeping the disks private by keeping them in his room and asking people to stay out, the voyeuristic images are not the kind of material that society is willing to recognize as a legitimate privacy interest.' " (*Wilkinson*, *supra*, 163 Cal.App.4th at p. 1563.) The court rejected this argument, which it characterized as "startling," "inasmuch as acceptance of it would largely obliterate the Fourth Amendment, because whenever a criminal prosecution is premised on contraband discovered during a warrantless search, the search that led to discovery of the contraband could always be justified on the ground the defendant did not have a legitimate expectation of privacy in the contraband." (*Ibid.*)

9

*Runyan, supra*, 275 F.3d 449; Annot., Validity of Search or Seizure of Computer, Computer Disk, or Computer Peripheral Equipment (2000) 84 A.L.R.5th 1; and Kerr, *Searches and Seizures in a Digital World* (2005) 119 Harv. L.Rev. 531.)

Quoting *Runyan*, the *Wilkinson* court noted that the defendant in *Runyan*, who was charged with possession of child pornography, "argued the police violated the Fourth Amendment by a warrantless examination of tangible materials, including computer discs, taken from his property by his wife (from whom he was separated). [Citation.] The police looked at the contents of a greater number of discs than the wife did during her private search. The [*Runyan*] court accepted the parties' stipulation that the computer discs were closed containers. [Citation.] The court recognized that a police viewing of items following a search by a private citizen does not constitute a search within the meaning of the Fourth Amendment as long as the view is confined to the scope and product of the initial private search. [Citation.] [¶] The *Runyan* court went on to explain, however, that '[*Jacobsen*, *supra*, 466 U.S. 109, at page 120] emphasized that the policie's actions in that case were unproblematic from a Fourth Amendment perspective because their actions "enabled . . . [them] to learn nothing that had not previously been learned during the private search." [Citation.] Thus, under *Jacobsen*, confirmation of prior knowledge does not constitute exceeding the scope of a private search. In the context of a search involving a number of closed containers, this suggests that opening a container that was not opened by private searchers would not necessarily be problematic if the police knew with substantial certainty, based on the statements of the private searchers, their replication of the private search, and their expertise, what they would find inside. Such an "expansion" of the private search provides the police with no additional knowledge they did not already obtain from the underlying private search and frustrates no expectation of privacy that has not already been frustrated.' [Citation.]" (*Wilkinson, supra*, 163 Cal.App.4th at pp. 1570-1571, citing *Runyan, supra*, 275 F.3d at pp. 452-453, 456, 458-459, 463.)

Continuing to quote *Runyan*, the *Wilkinson* court stated as follows: " 'The guideline that emerges from the above analysis is that the police exceed the scope of a

10

prior private search when they examine a closed container that was not opened by the private searchers unless the police are already substantially certain of what is inside that container based on the statements of the private searchers, their replication of the private search, and their expertise. This guideline is sensible because it preserves the competing objectives underlying the Fourth Amendment's protections against warrantless police searches. A defendant's expectation of privacy with respect to a container unopened by the private searchers is preserved unless the defendant's expectation of privacy in the contents of the container has already been frustrated because the contents were rendered obvious by the private search. Moreover, this rule discourages police from going on "fishing expeditions" by opening closed containers. *Any evidence that police obtain from a closed container that was unopened by prior private searchers will be suppressed unless they can demonstrate to a reviewing court that an exception to the exclusionary rule is warranted because they were substantially certain of the contents of the container before they opened it.*" (*Wilkinson, supra*, 163 Cal.App.4th at p. 1571, quoting *Runyan, supra*, 275 F.3d at pp. 463-464, italics added.)

After its extensive discussion of the analysis in *Runyan*, the *Wilkinson* court rejected the People's argument that "there was no expansion of the private search because the additional images Officer Walker viewed were just 'more evidence of the same crimes' and therefore did not harm defendant." (*Wilkinson, supra*, 163 Cal.App.4th at p. 1573.) "As in *Runyan*, however, neither the police (Officer Walker) nor the private searcher (Sadler) could have had a substantial certainty about the contents of any of the 36 compact discs taken from defendant's room. The discs on their face did not indicate their contents. The fact that the discs not previously viewed by Sadler were found in the same location (defendant's room) as the discs Sadler did examine was insufficient to establish the requisite substantial certainty." (*Wilkinson*, at p. 1573.) The *Wilkinson* court therefore held that, "as to any compact discs not viewed during the private search, Officer Walker's subsequent viewing of images on those discs, which Sadler showed Officer Walker at his direction, constituted a warrantless government search triggering the Fourth Amendment. The People offer no legal justification for that warrantless

11

search. Accordingly, contrary to the trial court's conclusion, an illegal search did occur in this case." (*Ibid.*, fn. omitted.) Likewise, the court held that, "[b]ecause the People failed to show that Detective Vigon's viewing was limited to discs that had been previously viewed during the private search, we conclude that Detective Vigon's viewing of the discs was an illegal search also." (*Id.* at pp. 1573-1574.)

Most of the pertinent federal cases take the position that police exceed the scope of a prior private search by examining containers or other materials that were not examined by the private searcher. (See, e.g., *United States v. Rouse* (8th Cir. 1998) 148 F.3d 1040, 1041 (*Rouse*); *United States v. Kinney* (4th Cir. 1992) 953 F.2d 863, 866; *United States v. Donnes* (10th Cir. 1991) 947 F.2d 1430, 1434 (*Donnes*); *United States v. Barth* (W.D. Tex. 1998) 26 F.Supp.2d 929, 937 (*Barth*).)

The *Runyan* court discerned tension between these cases. (*Runyan*, *supra*, 275 F.3d at pp. 458, 462, citing *Donnes, supra,* 947 F.2d at 1436; and *United States v. Kinney, supra,* 953 F.2d at p. 866), and the holding in *United States v. Bowman* (8th Cir. 1990) 907 F.2d 63 (*Bowman*). In *Bowman*, an airline employee opened an unclaimed suitcase containing five identical bundles. After opening one bundle and finding a white powdery substance wrapped in plastic and duct tape, he contacted a federal narcotic agent. The agent, who identified the opened bundle as a kilo brick of cocaine, then opened the others, which contained the same thing. The *Bowman* court (which did not determine whether the bundles were "containers" as that term has been used in the context of Fourth Amendment jurisprudence) found that the warrantless search of the remaining identical bundles was proper because the opened bundle " ' "spoke volumes as to [the] contents [of the remaining bundles]—particularly to the trained eye of the officer." ' " (*Id.* at p. 65.)

The *Runyan* court harmonized *Bowman* with cases, such as *Donnes* and *Kinney*, which hold that the police exceed the scope of a private search when they open a container that had not been examined by the private searcher, by looking to the Supreme Court's opinion in *Jacobsen*. As *Runyan* noted, *Jacobsen* "emphasized that the police's actions in that case were unproblematic from a Fourth Amendment perspective because

12

their actions 'enabled . . . [them] to learn nothing that had not previously been learned during the private search.' " (*Runyan*, *supra*, 275 F.3d at p. 463, quoting *Jacobsen, supra*, 466 U.S. at p. 120.)  *Runyan* reasoned that "*Jacobsen* harmonizes *Bowman* with *Kinney* and *Donnes*" because, "[b]ased on their inspection of the one bundle opened by the private searchers, their own expertise, and the apparent similarity of the bundles, the police in *Bowman* were substantially certain that the other four unopened bundles in the suitcase also contained kilos of cocaine.  Thus, they did not exceed the scope of the private search in simply confirming this substantial certainty, despite the fact that they looked at additional containers (or additional items within a container) that the private searchers did not examine." (*Runyan*, at p. 463; accord, *Rann v. Atchison* (7th Cir. 2012) 689 F.3d 832, 836 [finding no Fourth Amendment violation even if police searched digital media devices more thoroughly than private searchers, since private searchers knew contents of devices when they delivered them to police, and police were therefore " 'substantially certain' " the devices contained child pornography, citing *Runyan*]; *United States v. Oliver* (5th Cir. 2011) 630 F.3d 397, 408 [although private searcher did not search defendant's notebook, police did not exceed scope of private search when searching notebook because its contents were obvious].)  In contrast, in *Kinney* and *Donnes*, "by opening the additional container, [the police] were not simply confirming knowledge gained by private searchers." (*Runyan*, at p. 463.)

Based on the foregoing analysis, the *Runyan* court held that the police exceeded the scope of the private searches in that case "when they examined disks that the private searchers did not examine." (*Runyan*, *supra*, 275 F.3d at p. 464.)

Turning to the case before us, the pornographic videos found by the police in the flash drive are far from "identical" to the images found by Statham "of juveniles wearing little clothing and posing inappropriately," which the trial court described as "sexually suggestive, but not necessarily pornographic."  Moreover, there was nothing about the unopened video files, even to the trained eye, to suggest they were pornographic. Although the titles may have suggested they were pornographic, the trial court expressly found that "[t]he sexually explicit titles of the video files were discovered only after

13

Officer Clark directed Statham to open the video files." Thus, like the situations in *Runyan* and *Wilkinson* and unlike the situation in *Bowman*, the police were *not* in this case "substantially certain of the contents" of the video files before they opened them. (*Wilkinson, supra*, 163 Cal.App.4th at p. 1571, quoting *Runyan, supra*, 275 F.3d at pp. 463-464.)

The Court of Appeal in *Runyan* did not, however, end its analysis with the holding relied on by the Court of Appeal in *Wilkinson*. In a portion of the opinion the trial court here relied upon, which went beyond the holdings of other federal cases, the *Runyan* court dismissed the defendant's contention that the police also exceeded the scope of the private search in that case "because they examined more files on each of the disks than did the private searchers," and held that "the police do not exceed the scope of a prior private search when they examine the same materials that were examined by the private searchers, but they examine these materials more thoroughly than did the private parties. [Citation.]" (*Runyan, supra*, 275 F.3d at p. 464, citing *United States v. Simpson* (11th Cir. 1990) 904 F.2d 607, 610 (*Simpson*).)

In reaching this conclusion, the *Runyan* court rejected the reasoning of the Eighth Circuit in *Rouse, supra*, 148 F.3d at pages 1041-1042, which held that the police exceeded the scope of a private search in finding and inspecting more items within an airline passenger's bag than the airline employees had found in their prior private search, and agreed with the Eleventh Circuit's determination in *Simpson* that government agents' search of a box containing pornographic videos and magazines " 'did not exceed the scope of the prior private searches for Fourth Amendment purposes simply because they took more time and were more thorough' " than the private searchers. (See *Runyan, supra*, 275 F.3d at p. 461, citing *Simpson, supra*, 904 F.2d at p. 610.)[7] *Runyan*

_____

[7] In *Simpson*, a United States Attorney and F.B.I. agent viewed the box containing the pornographic material more thoroughly than the Federal Express employees from whom they received it; however, the court emphasized that "[t]he box's contents had already been examined [by the Federal Express employees], their illicit character had been determined, and they were open for viewing by the time the Assistant United States Attorney and the F.B.I. [a]gent arrived on the scene. Their search of the box and

acknowledged "that the Supreme Court has long recognized that individuals have an expectation of privacy in closed containers," but pointed out that "an individual's expectation of privacy in the contents of a container has already been compromised if that container was opened and examined by private searchers. [Citation.] Thus, the police do not engage in a new 'search' for Fourth Amendment purposes each time they examine a particular item found within the container." (*Runyan, supra*, 275 F.3d at pp. 464-465 compare *Rouse*, *supra*, 148 F.3d at pp. 1041-1042; *Barth*, *supra*, 26 F.Supp.2d 929, 937.)[8]

The facts of this case are strikingly different from those in both *Runyan* and *Simpson*. As discussed, prior to contacting police, Statham saw photographic images on appellant's computer that Officer Clark determined were not pornographic. In addition, Statham did not examine the materials he placed on the flash drive at any time prior to or after contacting the police. A warrantless police search certainly cannot be undertaken under the Fourth Amendment where, as here, the private searcher had *not* determined the illicit character of any images and, further, was unable to view the materials stored in a computer even after police directed him to open those files and to place them on a USB flash drive. Accordingly, the subsequent search of the flash drive by Officers Clark and Lee clearly exceeded Statham's prior private search. (Compare *Runyan*, *supra*, 275 F.3d at p. 465; *Simpson*, *supra*, 904 F.2d at p. 610.)

The trial court, however, found that the materials placed by Statham in a USB flash drive were contained in the "hard-drive" of appellant's computer, and treated that

_____

videotapes did not exceed the scope of the prior private searches for Fourth Amendment purposes simply because they took more time and were more thorough than the Federal Express agents." (*Simpson*, *supra*, 904 F.2d at p. 610.)

[8] In *Barth*, *supra*, 26 F.Supp.2d at page 937, a computer repairman discovered a single image of child pornography on a computer's hard drive. The district court rejected the government's argument that, once the single image was opened, the defendant lost his reasonable expectation of privacy in the files on his hard drive. (*Ibid*.) The court found, instead, that the defendant retained his reasonable expectation of privacy in the files and the subsequent viewing and copying of the defendant's entire hard drive therefore exceeded the scope of the repairman's original search. (*Ibid*.)

hard drive as the functional equivalent of, or analogous to, a closed container. On these grounds, the trial court reasoned that "[Officer] Clark's searches of the videos . . . were simply more thorough searches of the hard-drive 'container' that Statham had already opened. Evans' expectation of privacy in his hard-drive, which included the video files, had already been frustrated when he turned his computer over to Statham. Such searches are not in violation of the [Fourth] Amendment, and thus, suppression of the videos is not mandated."

The trial court's conclusion is predicated on the statements in *Runyan* that, as previously discussed, in the context of a closed container search, "the police do not exceed the private search when they examine more items within a closed container than did the private searchers," and that "an individual's expectation of privacy in the contents of a container has already been compromised if that container was opened and examined by private searchers . . . . (*Runyan, supra*, 275 F.3d at pp. 464-465.) Whatever the merits of the legal analysis in *Runyan*,[9] neither that opinion nor any other supports the ruling of the trial court in this case.

The fundamental flaw in the trial court's ruling relates to its assumption that a computer hard drive can properly be considered a "closed container," as that term is sometimes used in applying the Fourth Amendment. In *Runyan*, the court assumed without deciding that certain computer discs were closed containers. (*Runyan*, *supra*, 275 F.3d at p. 458) Here the putative container is not a computer disc, which contains a relatively small amount of data, but a computer hard drive, which ordinarily contains or connects to *all* the information stored in a computer. (See *Barth*, *supra*, 26 F.Supp.2d at p. 937; cf. 2 Crim. Proc. § 3.1(h) (3d ed. 2013 [finding *Rouse's* analysis "especially

---

[9] Appellant maintains that *Runyan* conflicts with the opinion of the United States Supreme Court in *Jacobsen* and the portions of the plurality opinion in *Walter*, *supra*, 447 U.S. 649 adopted in *Jacobsen*, claiming government examination of every file on a compact disc will invariably enable the government to obtain a "plethora of information that had not previously been learned during the private search." We need not decide whether the alleged conflict exists because, as will be seen, the trial court's reasoning cannot be sustained even under *Runyan*.

16

compelling" and *Runyan* rule "most clearly inadequate, in those cases where the 'container' in question (e.g., a computer or a filing cabinet) is filled with many items, only a few of which the private searcher examined"].)**[10]**

Noting that a "container" has been defined as " 'any object capable of holding another object,' " the United States Supreme Court has recently observed that "[t]reating a cell phone as a container whose contents may be searched incident to an arrest is a bit strained as an initial matter. [Citation]. But the analogy crumbles entirely when a cell phone is used to access data located elsewhere, at the tap of a screen. [This] is what cell phones, with increasing frequency, are designed to do by taking advantage of 'cloud computing.' Cloud computing is the capacity of Internet-connected devices to display data stored on remote servers rather than on the device itself. Cell phone users often may not know whether particular information is stored on the device or in the cloud, and it generally makes little difference. [Citation.]" (*Riley v. California* (2014) ___U.S.___, 134 S.Ct. 2473, 2491 (*Riley*), quoting *New York v. Belton* (1981) 453 U.S.454, 460, fn. 4.) The Court further stated: "Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life' [citation]. The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant." (*Riley*, at pp. 2494-2495.)

---

**[10]** We also observe that, unlike the parties in *Runyan*, who stipulated that, for purposes of adjudication in that case, the computer discs were closed containers, the parties in this case never agreed that appellant's hard drive is the functional equivalent of a closed container, an issue that never arose during the proceedings below. Indeed, the brief of the Attorney General takes the position that "the flash drive [not the hard drive] constituted the container" and that "Statham had viewed images stored within that container," a position that conflicts not just with the trial court's analysis but also its specific factual finding that "Statham had not seen the video files nor tried to open them prior to meeting with Officer Clark."

Because, as the Supreme Court observed, cell phones "are in fact minicomputers" (*Riley, supra,* 134 S.Ct. at p. 2489), and the search of a computer hard drive implicates at least the same privacy concerns as those implicated by the search of a cell phone, there is no reason to think conventional computers can any more reasonably be characterized as containers than cell phones. Indeed, "[c]omputers are relied upon heavily for personal and business use. Individuals may store personal letters, e-mails, financial information, passwords, family photos, and countless other items of a personal nature in electronic form on their computer hard drives." (*United States v. Mitchell* (11th Cir. 2009) 565 F.3d 1347, 1351, 1352 [describing "the hard drive of a computer, which 'is the digital equivalent of its owner's home, [as] capable of holding a universe of private information' "].)

The Supreme Court's analysis in *Riley* highlights the dangers inherent in lawyers and judges cavalierly applying established legal theories to new technologies, without carefully exploring the factual differences between such technologies and the objects traditionally found appropriate for those theories' application. (See *Riley*, *supra*, 134 S.Ct. at p. 2491.) As the Tenth Circuit Court of Appeals has observed: " 'Since electronic storage is likely to contain a greater quantity and variety of information than any previous storage method, . . . [r]elying on analogies to closed containers or file cabinets may lead courts to 'oversimplify a complex area of Fourth Amendment doctrines and ignore the realities of massive modern computer storage.' [Citation.]" (*United States v. Carey* (10th Cir. 1999) 172 F.3d 1268, 1275; see also Lessig, *The Path of Cyberlaw* (1995) 104 Yale L.J. 1743, 1752 [urging courts to "follow the meandering development of the common law" before "venturing too boldly" into the regulation of cyberspace].)

For these reasons, we hold that the trial court erred in describing the hard drive of defendant's computer as a closed container. Moreover, even if, as the People contend, the flash drive may be deemed a "closed container," as we have already discussed, the record reflects and the trial court found that Statham did not view the materials he placed in the flash drive before he was "directed" by Officer Clark to conduct a more thorough

18

search than the one that led him to contact the police. In placing the video files in the flash drive, Statham unquestionably "intended to assist law enforcement" and Officer Clark "knew of and acquiesced in" the "private" search Statham undertook at Clark's direction. (*Wilkinson, supra*, 163 Cal.App.4th at pp. 1566-1567.)

We reiterate the regnant principle articulated in *Jacobsen,* the opinion of the United States Supreme Court most pertinent to this case: "that the legality of the governmental search must be tested by the scope of the *antecedent private search*." (*Jacobsen*, *supra*, 466 U.S. at p. 116, italics added.) As *Jacobsen* explains, "[t]his standard follows from the analysis applicable when private parties reveal other kinds of private information to the authorities. . . . *Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information. . . . The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated. In such a case the authorities have not relied on what is in effect a private search, and therefore presumptively violate the Fourth Amendment if they act without a warrant.*" (*Id*. at pp. 117-118, fn. omitted, italics added.)

The factual findings made in this case, which are uncontested, indisputably establish that the government authorities have used information in which appellant's expectation of privacy was *not* frustrated by Statham's private search. Accordingly, the conclusions upon which the trial court based its ruling—namely, that Officer Clark's and Officer Lee's searches "were simply more thorough searches of the hard-drive 'container' that Statham had already opened," and that appellant's "expectation of privacy in his hard-drive, which included the video files, had already been frustrated when he turned his computer over to Statham"—are wholly untenable.[11] The fact that

---

[11] Moreover, nothing in *Runyan, supra*, 275 F.3d 449, which the trial court treated as controlling, suggests otherwise. Assuming that the computer discs in that case were "containers," the court concluded that the defendant "appears to have manifested his subjective expectation of privacy in the electronic images in question by storing the images in these 'containers.' " (*Id*. at p. 458, citing *Barth, supra*, 26 F.Supp.2d 929, 936-937 [finding that the owner of a computer manifested a reasonable expectation of privacy

19

neither Statham, a computer specialist, nor Officer Clark were able to open the video files strongly suggests appellant took precautions to maintain his privacy with respect to these materials.

The notions the trial court relied upon—that Statham initially "believe[d] in good faith that he had discovered pornography," and that appellant was, in effect, " 'hanging his dirty laundry out to dry' by handing it over to a third party he knew was going to look at it"—beg the central question pertinent to the scope of Statham's private search: whether it frustrated appellant's subjective expectation in the privacy of the materials searched and seized by the government in this case. As we have explained, Statham's search did not frustrate that expectation of privacy, which is clearly one society recognizes as reasonable.

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court with directions to vacate its ruling denying appellant's motion to suppress and to grant the motion.

---

in the data filed by storing them in a computer hard drive] and *United States v. Chan* (N.D. Cal. 1993) 830 F.Supp. 531, 534-535 [analogizing data in a pager to contents of a closed container].)

                                 _____

                                 Kline, P.J.

We concur:


_____

Richman, J.


_____

Stewart, J.


A138712, *People v. Evans*

21

Trial Court:                          Mendocino County Superior Court

Trial Judge:                          Clayton L. Brennan

Attorney for Appellant:               Maria Leftwich
                                      By appointment of the Court of Appeal
                                      under the First District Appellate Project

Attorneys for Respondent:             Kamala D. Harris
                                      Attorney General of California

                                      Dane R. Gillette
                                      Chief Assistant Attorney General

                                      Gerald A. Engler
                                      Senior Assistant Attorney General

                                      Eric D. Share
                                      Supervising Deputy Attorney General

                                      Ronald E. Niver
                                      Deputy Attorney General